UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| AZIMEH AZARM and ESMAEIL YAZDANI, ) | |
| ) | |
| Plaintiffs, ) | Case No. 3:08-1220 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| $1.00 STORES SERVICES, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is the issue of whether this case should indeed be transferred to the United States District Court for Nevada, as this court previously ordered. (Docket No. 18.) As directed by the court subsequent to that Order, the parties have further briefed this issue (Docket Nos. 32 and 34), and the court concludes that, in light of further relevant facts brought to the attention of the court, this case should not be transferred. As the court's previous Memorandum and Order (Docket Nos. 17 and 18) were entirely directed to the venue issues in this case, and, as this case is now determined to be properly before this court, the court's March 23, 2009 Memorandum and Order will be vacated, and, in subsequent briefing, the parties should consider themselves free to address any issue other than the propriety of this case proceeding before this court.

## FACTUAL AND PROCEDURAL BACKGROUND

The court provided a thorough recitation of the facts as stated in the plaintiffs' Complaint in conjunction with its March 23, 2009 Memorandum and Order, and it is not necessary to fully recite those facts here. (See Docket No. 17.) By way of a brief review, the plaintiffs' Complaint

1

alleges that, in November 2007, the plaintiffs entered into a franchise Purchase Agreement with the defendant, $1.00 Stores Services (DSS), by which, in exchange for a franchise fee, the defendant agreed to provide assistance to the plaintiffs in their opening and operation of a dollar store in Brentwood, Tennessee. The store was a failure, remaining open for less than one year.

In November 2008, the plaintiffs sued the defendant in Tennessee Chancery Court, asserting violations of the Tennessee Consumer Protection Act (TCPA) along with claims of promissory fraud, fraudulent/negligent misrepresentation and unjust enrichment, all connected to statements (outside of the Purchase Agreement) that the defendant allegedly made about the level of support it would provide to the plaintiffs in conjunction with the opening and operation of the dollar store, including statements that allegedly promised help with issues such as lease negotiation, location for the business, and financing.

In December 2008, the defendant, who is based in Nevada, removed the case to this court under diversity jurisdiction. The defendant then filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(3) for improper venue and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (Docket No. 4.) In conjunction with the Rule 12(b)(6) motion, the defendant pointed out that the Purchase Agreement contains a "merger" or "integration" clause, which states that "there are no representations or agreements either oral or written except those contained" in the Purchase Agreement. (Docket No. 4 Ex. A. at 6.) The defendant argued that this clause barred the plaintiffs from asserting claims based on language other than that in the Purchase Agreement, and, therefore, this clause rendered the plaintiffs' claims, which are largely based on statements made before the Purchase Agreement was signed, unsustainable. (Docket No. 5 at 3-6.) Because the court viewed the venue issues as dispositive, it did not explore this

2

argument in its prior Memorandum.

In support of its Rule 12(b)(3) motion to dismiss for improper venue, the defendant argued that the Purchase Agreement has a forum selection clause, which states that "[DSS] and [the plaintiffs] agree that this agreement shall be deemed to have been executed in the State of Nevada and that the Statutes and Courts of Nevada shall govern and adjudicate any and all disputes which may arise from this Purchase Agreement. [The plaintiffs] waive[] right to a jury trial in any such proceedings."  (Docket No. 4 Ex. A at 5.)  The defendant argued that, in light of the forum selection clause, the case should be dismissed.  (Docket No. 5 at 6-8.)

In response, among other arguments, the plaintiffs asserted that, under the plain language of the Sixth Circuit's *Kerobo* decision, a defendant cannot obtain a dismissal of an action on the grounds of improper venue after having properly removed it to federal court.  (Docket No. 9 at 18 citing *Kerobo v. Southwestern Clean Fuels Corp.*, 285 F.3d 531 (6th Cir. 2002)).  A review of *Kerobo* showed that the plaintiffs were correct, and the court, therefore, concluded that "*Kerobo* stands for the proposition that, if a defendant has properly removed a case from state court to federal district court pursuant to 28 U.S.C. § 1441(a), venue cannot be 'improper' for purposes of a Rule 12(b)(3) motion to dismiss for improper venue, even if the parties to the litigation have a forum selection agreement that dictates that all disputes between the parties will be adjudicated in a United States court other than the court to which the case was removed."  (Docket No. 17 at 14-15.)  Therefore, this court concluded that the defendant's Rule 12(b)(3) motion clearly should be denied.

However, a reading of *Kerobo* shows that denial of the Rule 12(b)(3) motion is not the end of the venue inquiry in this context.  As this court stated in its Memorandum, "*Kerobo* and

3

subsequent Sixth Circuit case law instruct that, in this context, as a matter of course, the court should consider whether to transfer venue under 28 U.S.C. § 1404(a). ... That is, once the court concludes that, because the case was removed, a Rule 12(b)(3) dismissal is not possible, Section 1404(a) 'governs the parties' venue dispute' and dictates whether the forum selection clause should be enforced." (Docket No. 17 at 15 citing *Kerobo*, 285 F.3d at 539 and *Langley v. Prudential Mortgage Capital Co., LLC*, 546 F.3d 365, 370-71 (6th Cir. 2008) (Moore, J concurring)).

Therefore*,* as "Section 1404(a) [now] govern[ed] the parties' venue dispute," the court turned to the Section 1404(a) analysis, that is, the court analyzed whether, under the factors identified in Section 1404(a), this case should be transferred to the district in which the defendant contended venue was more appropriate, the District of Nevada. While the parties had not explicitly briefed the Section 1404(a) factors, they had briefed related issues in conjunction with the Rule 12(b)(3) motion, and the court was able to rely on the substantial information that the parties had provided to the court about the pros and cons of this case remaining before this court versus proceeding in Nevada. Consistent with the instructions in *Kerobo*, this court conducted the Section 1404(a) analysis and concluded that transfer of this action was appropriate. On March 23, 2009, this court ordered the case transferred to the District Court of Nevada. (Docket No. 18.)

On April 6, 2009, the plaintiffs filed a Motion to Alter Judgment. (Docket No. 20.) The plaintiffs claimed that they "did not have any opportunity to present argument or evidence to the court addressing the case-specific factors that are to be considered when determining whether a transfer under Section 1404(a) is appropriate." (Docket No. 20 at 2.) Further, in their attached

4

brief, the plaintiffs "took issue" with the court's conclusion that the parties could have sufficiently briefed the transfer issue, because "plaintiffs never contemplated, because it was never raised, the possibility of the action being transferred to Nevada."[1] (Docket No. 23 at 4.)

Along with the motion, the plaintiffs filed affidavits in which they outlined, among other things, their strained financial position and the financial hardship that they would incur if they were forced to pursue this case in Nevada. (Docket Nos. 21-22.) In the attached brief, plaintiffs' counsel noted (as far as the court can tell, for the first time) that they are handling this case on a *pro bono* basis, and counsel pointed out that the plaintiffs would likely have difficulty obtaining similar *pro bono* counsel in Nevada. (Docket No. 23 at 13.) In short, the plaintiffs raised the argument that it would be unjust to transfer this case to Nevada, as doing so might effectively deny the plaintiffs their day in court.[2] The plaintiffs requested that the court "allow the parties an opportunity to present evidence and fully brief the transfer of venue issue." (Docket No. 23 at 14.)

In response, the defendants asserted that "the plaintiffs had sufficient notice and opportunity to brief the issue before the court" and, indeed, that the "plaintiffs presented

---

[1] Given that the plaintiffs had brought *Kerobo* to the court's attention and presumably read the language stating that Section 1404(a) "governs the parties' venue dispute" in this context, the court assumed that the plaintiffs understood that a Section 1404(a) discussion in the court's opinion was likely. The plaintiffs were further put on notice of this fact, when the defendant, in its reply, repeatedly cited Section 1404(a) and discussed its amenability to transfer of this case under Section 1404(a). (Docket No. 12 at 5.) That said, the plaintiffs never sought leave to file a surreply. Thus, it was certainly logical for this court to assume that both parties understood a Section 1404(a) analysis was appropriate and that the parties had provided the court with the materials that they wished the court to consider under that analysis.

[2] Along with the April 6 Motion to Alter or Amend the Judgment, the plaintiffs also filed a Motion to Amend their Complaint (Docket No. 24), which the court granted over the defendant's objection. (Docket No. 30.)

5

significant information" relevant to the Section 1404(a) factors. (Docket No. 27 at 3-5.) That said, the defendant's response did not relieve the court of its concern that additional factors unknown to the court might affect its analysis of the issue. Therefore, the court granted the plaintiffs' Motion to Alter or Amend "to the extent that the court will permit the parties a further opportunity to brief the propriety of transferring this case under Section 1404(a)." (Docket No. 30.) The parties timely filed their briefs and other papers on this issue, and the court now turns to the points raised therein.

## ANALYSIS

### I. The Transfer Issue

Section 1404(a) dictates that, "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In determining whether to transfer a case pursuant to Section 1404(a), a district court should consider a number of "case-specific factors," including the existence of a forum selection clause, as well as "the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moses v. Business Card Express, Inc.*, 929 F.2d at 1131, 1136-37 (6th Cir. 1991). Here, there is no dispute that this case could have been brought in the District Court of Nevada, and, through this subsequent briefing, the parties have identified the Section 1404(a) factors relevant to this venue dispute, which the court discusses in turn.

### A. The Forum Selection Clause

As this court noted in the initial Memorandum, for purposes of the Section 1404(a) analysis, a forum selection clause is "a significant factor that figures centrally" in the determination of whether to transfer a case. *Moses*, 929 F.2d at 1136 (quoting *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). That said, the existence of such a clause "should receive neither dispositive consideration . . . nor no consideration . . . but rather the consideration for which Congress provided in § 1404(a)." *Id.* That is, the forum selection clause is a key factor in the Section 1404(a) analysis, but other factors must be considered as well, and those factors might overwhelm the influence of a valid forum selection clause. *Id.*

The presence of an apparently valid forum selection clause was obviously important to the court's initial decision to transfer this case. In the subsequent briefing, the plaintiffs have not intensively pressed their earlier argument that the forum selection clause (along with other contractual provisions) is invalid or not relevant. Rather, the plaintiffs argue that, even if the forum selection clause is relevant, the court should not afford the clause substantial weight here, and, certainly, the clause should not be used as the court's primary consideration in deciding whether to transfer this case. The plaintiffs offer two main reasons for this argument: (1) that the other Section 1404(a) factors, particularly the convenience of the parties and witnesses, strongly favor not transferring this case and (2) that they are not sophisticated businesspeople and, therefore, under Section 1404(a), it would not be in the "interests of justice" to transfer this case, despite the forum selection clause. (*See e.g.* Docket No. 32 at 2-3.)

Therefore, for the purposes of this opinion, the court will consider the forum selection

clause valid, and a factor that weighs in favor of transferring this case.[3] As discussed above, the presence of a valid forum selection clause does not necessarily mean that transfer of the action is appropriate, because other Section 1404(a) factors may act as a sufficient "counterweight" to the forum selection clause such that they dictate the result. .*Moses*, 929 F.2d at 1136; *Stewart Organization*, 487 U.S. at 31. Here, the arguments raised by the plaintiffs in subsequent briefing indicate that such a counterweight is present in this case.

### B. Convenience of the Parties and Witnesses

As noted above, the convenience of the parties and the potential witnesses in this case is an important issue for the court to consider in the transfer analysis. *Moses*, 929 F.2d at 1136-37. While the convenience of all parties and potential witnesses is important, the convenience of potential non-party witnesses, who are not subject to the control of the parties, is a particularly weighty consideration, because it is generally presumed that party witnesses will appear voluntarily in either jurisdiction, but non-party witnesses, with no vested stake in the litigation, may not. *See Steelcase, Inc. v. Smart Tech, Inc.*, 336 F. Supp.2d 714, 720-21 (W.D. Mich. 2004).

#### i. The parties

For their part, the plaintiffs argue that it would not only be inconvenient for them to attempt to pursue this litigation in Nevada, it would be virtually impossible. Supported by their own affidavits, the plaintiffs argue that they have "extremely limited financial and other resources," as the plaintiffs and their four children rely exclusively on the meager income

---

[3]As the court's previous Memorandum and Order will be vacated, however, the opinions previously stated by the court about the enforceability of contract provisions should not be considered binding (one way or the other) on the parties.

8

generated by plaintiff Yazdani's small, and, apparently struggling, auto repair shop in Nashville. (See Docket No. 32 at 5.) Crippled by credit card and utility bills and a mortgage that they can barely afford, the plaintiffs are required to live with the support of food stamps and subsidized health care. (*Id.*) In short, the plaintiffs contend that any out-of-pocket costs that they would need to incur in conjunction with this litigation proceeding in Nevada (airfare, child care expenses, etc.) "would further cripple this family financially." (*Id.*) Additionally, as noted above, the plaintiffs point out that they are represented by counsel on a *pro bono* basis, and the plaintiffs speculate that "finding *pro bono* representation [] in Nevada would likely be impossible," because the plaintiffs are not residents of Nevada. (*Id.* at 6.)

The plaintiffs acknowledge that a sophisticated businessperson in the plaintiffs' position might have recognized that, given the forum selection clause, the Purchase Agreement created the unpleasant (at least for the plaintiffs) possibility of litigating disputes in this case in Nevada. (*Id.*) That said, the plaintiffs argue that they are not sophisticated businesspeople, but that they are poor Iranian immigrants with little business experience and that they "could not reasonably have anticipated, at the time they signed the agreement, the dire financial situation they find themselves in now," particularly as they ended up spending about $100,000 on a dollar store that provided no return on the investment. (*Id.*) In sum, the plaintiffs argue that they are in desperate financial straits, cannot afford counsel and that, simply, "transferring the case to Nevada is financially out of reach for plaintiffs and will almost certainly deprive plaintiffs of their day in court." (*Id.* at 7*.)*

In response, while the defendant challenges the plaintiffs "lack of sophistication" argument with speculation (albeit reasonable) that plaintiff Yazdani must have gained some

9

business acumen simply by running a small business, the defendants do not have an effective argument in response to the plaintiffs' claims that pursuing this litigation in Nevada would likely be impossible for them. (Docket No. 34 at 2.) The defendant argues that the plaintiffs have not submitted any "verified financial statements demonstrating financial hardship." (*Id.* at 5.) But, clearly, the plaintiffs' affidavits, along with the fact that they are being represented *pro bono*, demonstrate that the plaintiffs are in dire financial straits (largely because of their failed dollar store), and that they could not afford any significant out-of-pocket costs that would be incurred as a result of this litigation being transferred.

The defendant does correctly point out that, while the plaintiffs "speculate that they will not be able to obtain *pro bono* counsel in Nevada ... that allegation is simple speculation. Plaintiffs ... fail[] to mention any attempt or even problem identifying and locating counsel for the plaintiffs in Nevada." (*Id.* at 6.) While this is an accurate statement, the difficulties the plaintiffs would incur are obvious. As the plaintiffs do not live in Nevada, it would be very difficult for the plaintiffs to find a willing Nevada lawyer to take their case *pro bono*, and, even if they were successful, financial realities would prevent a face-to-face relationship.

Finally, the defendant argues that proceeding in Tennessee would be "extremely inconvenient" from its perspective. (*Id.* at 5.) DSS notes that it maintains no offices in Tennessee, has no employees in Tennessee, and "all employees of DSS with personal knowledge of relevant facts are located in Nevada." (*Id.* at 6.) DSS argues that, unlike the plaintiffs, it would be forced to pay all legal fees and the costs associated with sending its employees to Tennessee for "depositions, discovery related matters and trial." (*Id.*) The defendant argues that, in this relatively poor economic climate, these costs "may be crippling." (*Id.*) Other than

10

these extremely broad strokes, the defendant does not divulge further information that might show it is in particularly difficult financial straits.

The plaintiffs' subsequent revelation that they are being represented by *pro bono* counsel is very significant. Numerous courts have found that, where a transfer of venue would upset or destroy a *pro bono* counsel relationship due to increased costs and inconvenience, that fact weighs against transfer of the action. *See e.g. Sanders v. Johnson*, 2005 WL 2346953, *2 (S.D. Tex. Sept. 26, 2005); *Montemayor v. Fed. Bureau of Prisons*, 2005 WL 3274508, *6 (D.D.C. August 25, 2005); *Joslyn v. Armstrong*, 2001 WL 1464780, *4 (D. Conn.. May 16, 2001). In initial briefing, the plaintiffs' (less detailed) claims of financial hardship rang somewhat hollow, because they were represented by a large regional law firm. Now that the plaintiffs have revealed that this is a *pro bono* relationship, it is clear to the court that the plaintiffs' somewhat dire financial condition, combined with the limitations of their *pro bono* counsel, together indicate that it would indeed be extremely, likely devastatingly, inconvenient for the plaintiffs to attempt to pursue this litigation in Nevada. Therefore, on further review and receipt of additional information, the convenience of the parties factor weighs against transfer.

### ii. The witnesses

As discussed above, the convenience of witnesses, particularly non-party witnesses, is a crucial consideration in the transfer analysis. In initial briefing, the plaintiffs made vague reference to a few potential non-party witnesses (some of dubious relevance), who were located in Tennessee, but they provided few details. (Docket No. 9 at 23.) This time around, the plaintiffs have identified and provided substantial information about three potential non-party witnesses, all of whom reside in Tennessee, and it appears as if all three witnesses would be of

11

substantial assistance to the plaintiffs in maintaining and establishing their claims. It appears unlikely that any of these witnesses would testify in this case, were it to be transferred to Nevada.

Specifically, the plaintiffs designate Charles Warner, an employee of Baker Storey McDonald Properties, the Nashville real estate management company that worked with the defendant in negotiating the plaintiffs' dollar store lease. (Docket No. 33.) In her affidavit, plaintiffs' counsel states that Warner "is expected to testify about his interaction with a representative of [DSS] in the process of negotiating the lease of plaintiffs' store ... . He is also expected to testify about his concerns about plaintiffs' financial condition and ability to meet the lease terms." (Docket No. 33 at 1-2.) The plaintiffs also apparently plan to call a Nashville-based representative from Colliers Turley Martin Tucker, the company that managed the Mill Creek Town Center (where the dollar store was located) as of September 2008; plaintiffs' counsel states that this representative "will testify about the vacancies in the Mill Creek Town Center at the time plaintiffs terminated their lease and plaintiffs' efforts to mitigate their damages ... ." (*Id.* at 2.) Finally, the plaintiffs apparently plan to call the Nashville-based loan officer "at the bank where plaintiffs obtained their home equity loan to pay defendant [its franchise fee]." (*Id.*) According to her affidavit, plaintiffs' counsel anticipates that "this witness will testify about communications she had with defendant ... to arrange plaintiffs' financing through the bank in order to pay defendant the cost of opening a store." (*Id.*)

The plaintiffs correctly point out that all three of these individuals, as they are based in Nashville, would likely be subject to compulsory process here, but not if this case was transferred to Nevada. (*Id.* citing Fed. R. Civ. P 45(c)(3)(A)(ii)). In her affidavit, plaintiffs'

12

counsel states that she has confirmed that at least Warner and the Colliers Turley representative would not voluntarily travel to Nevada to testify in the trial of this matter. (*Id.*) While the defendants reference the financial costs associated with sending their party witnesses to Tennessee, they identify no non-party witnesses who might be inconvenienced if this case remained before this court.

In subsequent briefing, the plaintiffs have shown that transfer of this case would make it substantially more difficult for them to offer their proof in this case, as three witnesses, who would all provide testimony directly relevant to the plaintiffs' claims, are all located in Nashville, and at least two of those witnesses have apparently already indicated that they would not voluntarily travel to Nevada to testify. This new information weighs heavily against the transfer of this case. Obviously, the ability to have the testimony of non-party witnesses at trial is vital, and, therefore, numerous courts have concluded that, when relevant, this convenience factor is one of the most important in the Section 1404(a) analysis. *Steelcase*, 336 F. Supp. 2d at 720-21; *Biometics LLC v. New Womyn, Inc.*, 112 F. Supp.2d 869, 876 (E.D. Mo. 2000). Here, the plaintiffs have come forth with evidence that three vital witnesses would be inconvenienced if this case were transferred, likely to the point that they would not testify. The defendant has not identified any witnesses in the same position. On this new information and clarification, it is clear that this factor strongly weighs against transfer.

### C. The "Public" Factors and the "Interests of Justice"

As noted above, the "interests of justice," which include "public-interest concerns, such as systemic integrity and fairness" are important considerations in determining whether to transfer a case. *Moses*, 929 F.2d at 1136-37. The parties' subsequent briefing on these factors

13

provided little new information. For the plaintiffs, this section of their subsequent briefing is dedicated to arguing that the forum selection clause should not be afforded considerable weight, because the plaintiffs are not sophisticated businesspeople. (*See e.g.* Docket No. 32 at 11-16.) The plaintiffs provide a wealth of case law that stands for the proposition that courts do often at least reference the sophistication of the parties before using the forum selection clause as a basis for transfer. (Docket No. 32 at 12 citing *e.g. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972); *Preferred Capital, Inc. v. Associates in Urology*, 453 F.3d 718, 723 (6th Cir. 2006)).

The defendant responds by arguing that the plaintiffs' pleas of lack of sophistication are inconsistent with the facts adduced to this point, specifically that one of the plaintiffs (Yazdani) owns his own auto mechanic shop, and, therefore, he must have experience in negotiating contracts for business premises and supplies, despite his present claims that he cannot read English and has only an eighth-grade Iranian education. (Docket No. 34 at 3; Docket No. 22.) The defendant argues that Yazdani must deal with relatively complicated and sophisticated issues of inventory and supply and that he must have to interact with customers and suppliers in English and in writing. (*Id.*) In short, the defendant argues that the plaintiffs' alleged lack of sophistication in business matters is not a valid reason not to transfer this case based on the forum selection clause.

Further, the defendant argues that, in the interests of fairness and justice, the forum selection clause should be a primary consideration because, absent fraud, a party is "conclusively presumed to know the contents" of the contract he signed, and that he "must suffer the consequences" thereof. (Docket No. 34 at 3 citing *State v. Good Times, Ltd.*, 2008 WL 4334894, *4 (Tenn. Ct. App. Sept. 23, 2008)). The defendant insists that ignoring the forum selection

14

clause would "reward" the plaintiffs for violating a term of the parties' agreement and would make "litigants free to file a claim in any venue without regard to contractual agreements or legal authority, thereby setting up an almost impenetrable wall precluding transfer." (Docket No. 34 at 4.)

After this "interests of justice" discussion in the subsequent briefing, the court continues to believe that the convenience factors that the plaintiffs have subsequently identified should carry the day. The Supreme Court has repeatedly held that, while a presumptively valid forum selection clause weighs in favor of a case proceeding in the forum selected, the forum selection clause is not the only relevant factor in the 1404(a) analysis, but it is one factor that may be outweighed by others. *Zapata*, 407 U.S. at 15; *Stewart Organization*, 487 U.S. at 31. Initially, the court gave heavy consideration to the forum selection clause because the plaintiffs had not provided any compelling "counterweight." Now, however, in subsequent briefing, the plaintiffs have offered a compelling basis to leave this case where it is, despite the forum selection clause.[4]

---

[4] Under the "interests of justice" and "public interests" discussion, the plaintiffs also argue that the docket of this court is significantly less congested than that of the District Court of Nevada. (Docket No. 32 at 9.) The relative condition and congestion of the dockets in the proposed transferor and proposed transferee court is one of many potential considerations in the "public interests" analysis; that is, if one court's docket is less congested and, on average, one court disposes of cases quicker and/or brings them to trial faster, it may make sense to ensure that the case is before the less congested court. *See e.g. Fannin v. Jones*, 229 F.2d 368, 369-70 (6th Cir. 1956). Here, the plaintiffs argue that public records show that the median time from filing to disposition (no court action) and filing to trial is significantly longer in the District Court of Nevada versus this court (filing to disposition 9.1 months [MDTN] and 10.9 months [Nevada] and filing to trial: 21 months [MDTN] and 32 months [Nevada].) (Docket No. 32 at 9-10.) The defendant counters that, given the high likelihood that a civil case will settle prior to trial, "the court should pay closer attention to the difference between the districts as regards the median time from filing to disposition of the case (without a trial)," which is relatively small. (Docket No. 34 at 7.) The court does not believe, given the other, clearly more salient, issues raised in this transfer discussion, that the docket congestion issue is particularly weighty here.

15

**D. Summary**

Through subsequent briefing, the plaintiffs have produced additional information that shows that it would be improper to transfer this case, despite the forum selection clause and the connection this case holds to Nevada. Most importantly, the plaintiffs have identified three important non-party witnesses who, all indications are, would not testify in the case if it were to be transferred to Nevada, but would be subject to compulsory process if this case remained before this court. The identities and limitations of these witnesses were not known to the court until this subsequent briefing, and this point alone probably would be sufficient to tip the scales against transfer.

Also, however, the plaintiffs have revealed that their association with a large law firm is not because they have better financial resources than they revealed in initial briefing, but, rather, the association is rooted in a *pro bono* relationship originating from the local Legal Aid society. A transfer of this action would likely rupture that relationship, leaving the plaintiffs with no counsel at all and a case pending in a far away jurisdiction beyond their financial ability to access.

The defendant's arguments about the costs that it would incur and the importance of enforcing contractual agreements do not fall on deaf ears. But again, the convenience of the party seeking transfer and the existence of a forum selection clause are only factors in the Section 1404(a) analysis; they are not decisive. Here, taking all the factors together and weighing them with the most complete information available, the court determines that the merits lie with retaining this case in this forum.

A brief note on where this case stands now is worthwhile. In light of the vacating of the court's March 23, 2009 Memorandum and Order, the only issue presently resolved in this case is whether this case will remain before this court, which it will. In its April 29, 2009 Order, which directed further briefing on the Section 1404(a) issue, the court stated that, if the court subsequently determined that the case should not transferred, the defendant would, of course, have an opportunity to respond to the plaintiffs' subsequently filed Amended Complaint "either by filing a new motion to dismiss, by supplementing the motion to dismiss already on file, or by resting on that motion." (Docket No. 30.) Obviously, the defendant is not required to file a motion to dismiss in response to the plaintiffs' Amended Complaint, as it may choose, instead to file an answer. Either way, the appropriate next step in this case is for the defendant to file a response to this Amended Complaint within twenty days from the date of entry of the Order that accompanies this Memorandum.

## CONCLUSION

For the reasons discussed herein, this matter will not be transferred to the District Court of Nevada, the court's March 23, 2009 Memorandum and Order will be vacated, and this case will proceed before this court.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge